## MAURICE SPIESS AND ANOTHER v. WILLIAM ARTHUR BRANDT AND ANOTHER.[1]

February 17, 1950.

No. 34,992.

---

[1]Reported in 41 N. W. (2d) 561.

*Fryberger, Fulton & Boyle* and *Doherty, Rumble, Butler & Mitchell,* for appellants.

*James J. Courtney & Son,* for respondents.

MATSON, JUSTICE.

Defendants appeal from an order denying a new trial in an action for the rescission, because of fraudulent representations, of a contract for the purchase of defendants' summer resort.

Defendants, father and son, in 1940 acquired Jameson's Wilderness Resort located 18 miles north of Hovland, Minnesota, on Lake McFarland. They continued to own and operate the resort until it was sold to plaintiffs by contract for deed December 17, 1947, for $95,000, with a down payment of $10,000 and with the principal balance of $85,000 payable as follows: $20,000 on or before February 15, 1948; $15,000 on or before April 15, 1948; $2,500 on or before July 15, 1948; $2,500 on or before October 1, 1948, and $2,500 on or before July 15 and October 1 of each year thereafter until paid in full. The contract provided that all sums paid prior to a default

should be retained by the vendors as liquidated damages. Plaintiffs made the down payment of $10,000 and the $20,000 due February 15, 1948, but thereafter found themselves unable to pay the April 15 installment, with the exception of $6,000, which was not paid until May 28, 1948. The court found—and this finding is sustained by the evidence—that the $6,000 was paid after defendants had agreed that they would not then foreclose but would give plaintiffs a reasonable time to raise additional funds through the sale of an equity in a home owned by one of the plaintiffs. Ten days later, on June 7, 1948, defendants served on plaintiffs a notice of cancellation of the contract. Shortly thereafter plaintiffs, who had not at any time theretofore been represented by counsel, consulted an attorney at law. About June 19, 1948, plaintiffs brought an action to rescind the contract on the ground of fraud and misrepresentation and to restrain defendants *pendente lite* from further cancellation proceedings. In open court, plaintiffs made a tender of a deed and other instruments necessary for a retransfer of the real and personal property, which tender was refused by defendants.

In addition to a finding that defendants had fraudulently concealed the fact that they had lost money each year, the trial court specifically found that during the negotiations and talks had between the parties prior to entering into the contract for deed defendants represented to plaintiffs:

(1) That defendants were making *good money* out of the resort;

(2) That plaintiffs could make *good money* out of it; and

(3) That plaintiffs could make all future payments on the contract out of the profits.

There are further findings that said representations:

(1) Were known by defendants to be untrue when they were made;

(2) Were made by defendants for the purpose of deceiving and inducing plaintiffs to enter into the contract for the purchase of the property at a price clearly in excess of its real value;

(3) Were relied upon by plaintiffs; and

(4) Were material and were an inducing factor causing plaintiffs to enter into the contract.

The trial court also found that defendants at all times knew that plaintiffs were young and inexperienced; that they had no property; that they wished to acquire this property as a means of livelihood; and that, in order to make future payments on the contract, they would have to make them out of the profits from the resort business. Pursuant to its findings, the court ordered judgment for rescission of the contract and for a return to plaintiffs of the $36,000 which they had paid, with interest. Defendants then moved for amended findings or a new trial, and, upon denial thereof, we have this appeal.

■■■■ We need consider only the first representation, namely, that defendants represented to plaintiffs that *they were making good money out of the resort business.* If the court's finding thereon is supported by the evidence, its order denying a new trial must be sustained, and it will be wholly unnecessary to consider the validity or factual basis of the other two representations *or* of the finding that defendants, when there was a duty to disclose, fraudulently concealed the material fact that they had lost money each year. It is well established that:

"A person is liable for fraud if he makes a false representation of a past or existing material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge without knowing whether it is true or false, with intention to induce the person to whom it is made to act in reliance upon it, or under such circumstances that such person is justified in acting in reliance upon it, and such person is thereby deceived and induced to act in reliance upon it, to his pecuniary damage." 3 Dunnell, Dig. § 3818. See, Gaetke v. Ebarr Co. Inc. 195 Minn. 393, 263 N. W. 448.

A false representation as to past or present income and profits is a false representation of a past or existing material fact within the

meaning of the above rule. This is particularly true where he who makes the representations knows them to be false.[2]

There is ample evidence—although it is conflicting—to sustain the findings that defendants did misrepresent the past income and profits of the resort. We have testimony, which the court could accept as true, that plaintiff Lowell Spiess, when a price of $100,000 was asked, specifically inquired of one of the defendants how long it would take to pay off that amount out of resort profits, and he was told that it could be paid off in five operating seasons. This answer obviously involved something more than a prediction of possible future earnings, in that it would have relation to defendants' past earning experience. Reasonably, there could be no basis for the answer other than that of defendants' past experience. This is corroborated by more specific testimony when Lowell, in response to his direct inquiry, was told that defendants in 1946 "took in" $25,400 with expenses of $6,000. This would indicate net earnings of $19,400 for 1946, which on a five-year basis would practically amount to the asking price of $100,000. One of the defendants admitted that he had stated that the gross income for 1947 was around $19,000. The undisputed facts are that defendants had lost money every year of their operation, inclusive of the years 1946 and 1947, which were generally conceded to have been the most prosperous years in the history of Minnesota's resort business. Defendants also told Lowell Spiess that they were making "good money," and the making of "good money" does not in any man's language—when addressed to persons seriously considering the purchase of a business—square with an undisputed record of substantial loss year after year. We are not here dealing with the mere puff talk of an enthusiastic salesman, but with a statement of

[2]Forman v. Hamilburg, 300 Mass. 138, 14 N. E. (2d) 137; Powers v. Rittenberg, 270 Mass. 221, 169 N. E. 913; Stumpf v. Lawrence, 4 Cal. App. (2d) 373, 40 P. (2d) 920; Miller v. Frederick, 171 Wash. 452, 18 P. (2d) 40; J. C. Corbin Co. v. Preston, 109 Or. 230, 218 P. 917; 23 Am. Jur., Fraud and Deceit, §§ 20 and 68; 37 C. J. S., Fraud, § 3, p. 215; see, Restatement, Torts, § 525*d;* O'Neil v. Davidson, 149 Minn. 457, 184 N. W. 194.

facts by one who is possessed of the facts to one to whom the facts are not readily available.[3]

Defendants' representations of making "good money" and of having taken in $25,400 in 1946 with expenses of $6,000 were made without qualification and were made as of the defendants' own knowledge. An unqualified affirmation amounts to an affirmation as of one's own knowledge. Schlechter v. Felton, 134 Minn. 143, 158 N. W. 813, L. R. A. 1917A, 556. Whether the representations were made innocently or knowingly, they would equally operate as a fraud upon plaintiffs when made unqualifiedly or as of defendants' own knowledge. A bad motive is not an essential element of fraud.[4] In the instant case, aside from the unqualified representation by defendants of their own knowledge, we have the significant circumstances that on several occasions plaintiffs expressed a desire to see the books—although this is denied by defendants—and that they always received a reply that the books were being worked on and were not then available. In fact, the books were not made available until they were brought into court. The persistent withholding by vendors of the books of business operations, after the making of direct representations of expenses and profits to prospective purchasers *who have expressed a desire to see the books,* justifies an inference by the trier of fact that such vendors at all times knew their representations were false and that they were made with intent to conceal the truth.

The rule that "The recipient in a business transaction of a fraudulent misrepresentation is not justified in relying upon its

[3]It has been held that, where the vendee after taking possession of a business at once experiences a business volume sharply below that represented to have been enjoyed by the vendor, an inference may be drawn that vendor's representation was false in that an established business will not at once seriously diminish without cause. Forman v. Hamilburg, 300 Mass. 138, 14 N. E. (2d) 137.

[4]Schlechter v. Felton, 134 Minn. 143, 158 N. W. 813, L. R. A. 1917A, 556; Bullitt v. Farrar, 42 Minn. 8, 43 N. W. 566, 6 L. R. A. 149, 18 A. S. R. 485; Hedin v. Minneapolis M. & S. Inst. 62 Minn. 146, 64 N. W. 158, 35 L. R. A. 417, 54 A. S. R. 628; 21 Minn. L. Rev. pp. 446 to 449; Restatement, Torts, § 526; 3 Dunnell, Dig. & Supp. § 3818.

truth if its falsity is obvious" (Restatement, Torts, § 541; 3 Dunnell, Dig. & Supp. § 3822) has no application here. The facts as to past profits were not obvious. In fact, it is the well-established rule that in a business transaction the recipient of a fraudulent misrepresentation of a material fact is justified in relying upon its truth, although he might have ascertained its falsity had he made an investigation. Restatement, Torts, § 540; 3 Dunnell, Dig. & Supp. § 3822. In the case at bar, we have the additional factors that defendants thwarted the efforts of plaintiffs to investigate, in that they withheld the books which were the only practical source of information for determining whether the resort had made money. Plaintiffs' attempt to make an investigation, and their subsequent conduct in proceeding with the transaction without having made it, was not a waiver of the right to rely upon defendants' representations. Schmeisser v. Albinson, 119 Minn. 428, 138 N. W. 775; 3 Dunnell, Dig. & Supp. § 3821; see, Restatement, Torts, § 547(2).

Not only did plaintiffs have the right to rely upon the truth of defendants' representations, but they did so in fact. It was both natural and reasonable for them to do so. At the time of the transaction, plaintiffs, Lowell and Maurice, who were brothers, were of the respective ages of 21 and 26 years, and they had not had any experience in operating resorts, either large or small. Lowell, the young brother, had operated a motion picture theater under the friendly tutelage of his father. Plaintiffs' visits to the resort, with some insignificant exceptions, were primarily recreational and did not give them a knowledge of the business. Defendants, on the other hand, were mature men of considerable experience in the resort as well as other business. Although the element of disparity in business experience is not of itself a sufficient ground for relief, nevertheless, the law does not ignore such disparity, especially where, as here, the inexperience of youth is coupled with an added factor of special trust and confidence growing out of a reasonable assumption by plaintiffs that a genuine and close friendship existed between them and defendants. See, Gable v. Niles Holding Co. 209 Minn. 445, 296 N. W. 525. On various occasions

when plaintiffs visited the resort to enjoy the out of doors, defendants had exhibited many manifestations of friendship. In youth, every manifestation of friendship seems genuine and deserving of special trust and confidence. Disparity may under some circumstance be a factor of considerable importance when we keep in mind that the question is not whether the representation would deceive the average man. In rescission actions for fraud, the question is whether the representations were of such a character and were made under such circumstances that they were reasonably calculated to deceive, not the average man, but a person of the capacity and experience of the particular individual who was the recipient of the representations. Kempf v. Ranger, 132 Minn. 64, 155 N. W. 1059. We have the further circumstance that defendants, by their long and personal operation of the resort, together with their exclusive possession of the books, were possessed of all the facts. We need not labor the point of plaintiffs' reasonable reliance on the representations made, because where representations are made by a party who is presumed to know their truth, reliance thereon will be presumed. Anderson v. Donahue, 116 Minn. 380, 133 N. W. 975; 3 Dunnell, Dig. & Supp. § 3821. We have repeatedly held that one who deceives another to his prejudice ought not to be heard to say in defense that the other party was negligent in taking him at his word. Gaetke v. Ebarr Co. Inc. 195 Minn. 393, 263 N. W. 448; Kempf v. Ranger, *supra;* 3 Dunnell, Dig. & Supp. § 3822.

The materiality of defendants' representations is so obvious from what has already been said that no discussion thereof is needed.

There was no unreasonable delay after the discovery of the fraud before commencing an action for rescission. Plaintiffs, who had been denied access to the books, were not in a position to learn the facts until they had a reasonable opportunity to observe the resort under operative conditions. They had no opportunity to commence operations until the spring of 1948. The evidence fully justifies a finding that plaintiffs discovered the fraudulent representations within a reasonable time after they had the opportunity to do so. We attach no significance to the fact that the action for rescission

was not commenced until shortly after defendants—contrary to their agreement with plaintiffs, as found by the trial court—commenced cancellation proceedings. No doubt the unwarranted cancellation properly made them more vigilant in discovering the true nature of the transaction.

Defendants contend that the trial court's decision does not conform to either the pleadings or the proof, in that it is based primarily on the finding that defendants, in violation of a duty to disclose, had fraudulently concealed that they had regularly lost money. It is unnecessary to consider this contention, in that the trial court's decision is sustained upon a different and wholly independent finding, namely, that defendants fraudulently represented to plaintiffs that *they were making "good money."* Where a trial court has made two or more independent findings of fact, and one of these findings of fact—the making of which has manifestly not been influenced or controlled by an error of law[5]—is wholly sufficient of and by itself to sustain the trial court's decision, no consideration need be given to the other findings, and any error with respect to them is immaterial. Where a decision is correct, it need not be sustained for the same reason or for all the reasons relied upon by the trial court. Iowa Guarantee Mtg. Corp. v. Kingery, 181 Minn. 477, 233 N. W. 18; 1 Dunnell, Dig. & Supp. § 421; 3 Am. Jur., Appeal and Error, § 1008.

Much ado has been made about the finding that plaintiffs lost money on their operations of the resort in 1948. Although the evidence reasonably sustains the finding, it is of no material consequence, for two reasons. In the first place, we are not concerned in an action for rescission with a question of damages. Kirby v. Dean, 159 Minn. 451, 199 N. W. 174; Gaetke v. Ebarr Co. Inc. 195 Minn. 393, 263 N. W. 448. In the second place, if the particular finding was used for any purpose other than that of throwing some light upon the rental value of the premises, as indicated by the subject of the paragraph in which it is embodied in the findings, such other purpose obviously must have been limited to the func-

---

[5]See, 3 Am. Jur., Appeal and Error, § 904.

tion of corroborating the finding that defendants fraudulently represented that plaintiffs *could make good money*. Whether evidence of plaintiffs' failure to make money in 1948 should have been considered for such other purpose need not be determined, because, as already indicated, the trial court's decision is sustained solely on the ground that defendants fraudulently represented that *they had made "good money,"* and not on the representation that plaintiffs *could make good money*. If it was error, it was error without prejudice.

■ Defendants assert that the trial court's finding that the improvements made to the resort premises by plaintiffs offset its rental value during the period of their occupancy is arbitrary and without support in the evidence. They alleged that the court failed to find the resort's fair rental value and that no proof was offered on the issue. Apparently defendants overlook the fact that, insofar as the defrauding parties are allowed any rental for the use of the premises in rescission for fraud proceedings, such allowance is made not by reason of any legal right, but purely as an equitable obligation of the parties each to the other to restore the *status quo ante* by each receiving substantially the property with which he parted without enjoying any unjust enrichment by retention of that of the other. It is simply a rule for meting out substantial justice, so that one may not enjoy unconscionable enrichment at the expense of another.[6] As a measure for substantially restoring the parties to the *status quo ante,* we find no abuse of discretion in the determination that plaintiffs' improvements offset the rental value. Testimony was freely admitted showing that the premises were in a run-down condition when plaintiffs took possession and that approximately $2,000 was justifiably expended by plaintiffs for reasonably necessary improvements. On the other side of the evidentiary ledger, we have ample support for a finding that the rental value during plaintiffs' occupancy did not exceed the value of plaintiffs' improvements. In finding

---

[6]Hatch v. Kulick, 211 Minn. 309, 1 N. W. (2d) 359, and note 2 thereof; Scheer v. F. P. Harbaugh Co. 165 Minn. 54, 205 N. W. 626; Kirby v. Dean, 159 Minn. 451, 199 N. W. 174.

rental value, the court could reasonably take into consideration the significant evidence that the resort property had for seven years—even during the most prosperous years of Minnesota's resort history—yielded only a loss under defendants' experienced management. The court could also consider plaintiffs' testimony with respect to the 1948 operations. Plaintiffs, after justifiably paying themselves a reasonable salary (Clark v. Wells, 127 Minn. 353, 149 N. W. 547, L. R. A. 1916F, 476), sustained a loss. For comparative purposes, the court also had the benefit of testimony by other resort operators in the area, who described their operations and physical plants. If we keep in mind that the only purpose for ascertaining the resort's rental value was simply to mete out substantial justice, so that plaintiffs might not enjoy unconscionable enrichment at the expense of defendants, and if we further keep in mind that the resort under the *status quo ante* operations had regularly yielded defendants a substantial loss year after year, the court could reasonably find that upon the evidence as a whole its rental value did not exceed the value of plaintiffs' improvements. There can be no doubt, insofar as defendants are concerned, that they received thereby their full measure of equity, without any unjust enrichment of plaintiffs.

12. The evidence has been conflicting, but it is clear, in the light of the evidence as a whole, that the findings are sustained by a fair preponderance of the evidence. The rule requiring clear and convincing evidence to justify a rescission of a contract for fraud is merely a rule of caution against setting aside written instruments upon weak and inconclusive evidence. A fair preponderance of the evidence is sufficient. McCarty v. New York L. Ins. Co. 74 Minn. 530, 77 N. W. 426; 1 Dunnell, Dig. & Supp. § 1202.

The order of the trial court is affirmed.

Affirmed.

PETERSON, JUSTICE (dissenting).

While I concur in the views of the majority as to the rules of law stated in their opinion, I dissent upon the ground that, in

any reasonable view of the facts, plaintiffs failed to prove a case of fraud.

The evidence conclusively shows that it became known that defendants were willing to sell the property in question for about $100,000. Plaintiffs were familiar with the property. They started negotiations to purchase it. Before defendants made any representations concerning the property, and consequently when plaintiffs were uninfluenced by any such representations, they made an offer to purchase for $90,000. After some negotiations, the parties agreed on $95,000 as the purchase price. The increase in the purchase price as a consequence of the negotiations was a little less than six percent of plaintiffs' offer before any representations had been made. A sale price increased, as a consequence of negotiations, such a slight amount above the buyers' offer, uninfluenced by any representations, cannot be said to be the result of fraud. As a practical proposition, the sale here was at plaintiffs' own price.

A painstaking reading of the record produces the conviction that the trial judge was influenced to find fraud because plaintiffs were young and inexperienced. Neither is a ground for finding fraud. While it is true that they were young, they were not inexperienced. As a consequence of experience, they had acquired unusual business acumen.

THOMAS GALLAGHER, JUSTICE (dissenting).

█ I concur in the dissent. The property was sold to plaintiffs for $95,000. There was substantial testimony, not seriously in dispute, that the reasonable value of the property was in excess of $100,000. In addition to the expert testimony on values submitted by the parties, the trial court, on its own initiative, called three neutral expert witnesses, owners and operators of similar resorts in the same general area, who were familiar with the property involved, to give their opinion as to its value. Their testimony thoroughly substantiated the opinions of defendants' experts as to value, and it clearly indicated that the property, if operated efficiently, was capable of producing a good net income. Under

such circumstances, it would seem that there was no substantial evidence to sustain the trial court's finding that the property had been sold for more than its worth.

■ The evidence submitted in support of plaintiffs' allegations as to misrepresentation relative to earnings would hardly seem to sustain a finding of fraud. The statements claimed to have been made by defendants relative thereto to future prospects. Most of them were made prior to the time when either plaintiffs or defendants contemplated a sale of the property. The most that can be drawn therefrom was that defendants had at times stated that they were "making good money" or that they had a "darn good business."

Prior to the letter of September 26, 1947, in which plaintiff Maurice Spiess offered to purchase the property for $90,000 (some $5,000 less than the price finally agreed upon), he had had but one conversation with defendant William Brandt and no conversations whatever with defendant John Carlos Brandt. His talk with William Brandt was immediately after he and plaintiff Lowell Spiess had talked over the matter of a purchase. Nothing was said at that time by either of the Brandts as to earnings of the resort for the year 1946. The conversation reflected only the expectations of William Brandt as to future prospects, in the light of full resumption of auto transportation after the war.

■ A written instrument executed with due formality and known to be executed for the purpose of embodying the agreements of the parties should not be set aside on the ground of fraud unless the proof is clear and strong. First Nat. Bank v. Schroeder, 175 Minn. 341, 221 N. W. 62; 3 Dunnell, Dig. & Supp. § 3839. Opinions expressed as to *future* prospects of a particular business cannot be used as a basis for fraud. Eurich v. Bartlett, 151 Minn. 86, 186 N. W. 138. Representations made after a decision to purchase cannot be regarded as inducements toward making the purchase agreement, since there could have been no reliance thereon. Nilsen v. Farmers State Bank, 178 Minn. 574, 228 N. W. 152; Rien v. Cooper, 211 Minn. 517, 1 N. W. (2d) 847.

■ With reference to the claim now made that defendants suppressed or withheld facts relating to their past experiences in the operation of the property, it may be said that this ground was never alleged by plaintiffs as a basis for recovery. Plaintiffs did request defendants' books covering past operations. These were not supplied, and at this point there was nothing to prevent plaintiffs from refusing to proceed with the transaction.

■ The court placed much reliance on the ages of plaintiffs, their lack of experience, and the fact that they had not operated properties of this type. John Carlos Brandt, one of the defendants, at the time he purchased the resort was not much older than plaintiff Lowell Spiess when he originally purchased it. Both plaintiffs had had experience in the operation of other properties. Lowell owned an interest in and operated a theater, while Maurice owned real estate in Newport. Both of such properties were to be sold by plaintiffs so that the proceeds might be used as part of the purchase price herein. Their parents and older brother were interested in this transaction and counseled and advised them in connection therewith. The parties were at all times dealing at arm's length.

■ It is asserted that defendants sustained a loss during prior years. This may be largely explained by the extensive capital expenditures made by them in improving the resort. For example, in 1947, $14,231 was put back into the properties in improvements. This, in itself, would indicate that defendants were making "good money" in the business. Many of such improvements were not of a recurrent nature and could be depreciated over a number of years.

■ No allowance was made for the use and rental value of the property during plaintiffs' possession thereof. During 1948, they not only had their living provided, but they were also able to acquire an automobile, an airplane, and at least $1,630.54 in cash from their operation of the resort. The trial court found that the improvements made by them offset the rental value of the property. No finding was made as to fair rental value. The improve-

ments consisted of repairs to motors, patching boats, and completing an apartment and kitchen. Plaintiffs actually received during the year 1948 $19,661.56 in their operation of the property. A gross income of this amount, with any kind of careful management, would yield a profit, and clearly establishes that the premises had a substantial rental value during the period of plaintiffs' occupancy thereof.

I cannot subscribe to the theory that this contract, made pursuant to an offer freely given, should be set aside on any of the grounds above outlined. If it may be thus rescinded, I fear that few contracts will withstand the onslaught of another business depression or the disappointment following an optimistic but inefficient purchaser's unsuccessful operation of property purchased.

