Adolph **FISCHER, Ida May Dayton, John Symiczek, Glen Christensen, Janice Bauman, Gene R. Bauers, and Bruce N. Gruper, Plaintiffs,**

v.

**DIVISION WEST CHINCHILLA RANCH** aka Division West Chinchilla Corporation, Defendants.

No. 5–69–Civ. 44.

United States District Court,
D. Minnesota,
Fifth Division.

March 10, 1970.

Friedman & Friedman, by Newton S. Friedman, Duluth, Minn., for plaintiffs.

Applequist, Lyons, Nolan, Donovan, Larson & Barnes, by Charles T. Barnes, Duluth, Minn., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

NEVILLE, District Judge.

At various dates in late 1966 and early 1967 the seven co-plaintiffs in this action, after listening to and being motivated by defendant's television advertisements, each paid or obligated themselves to pay $2,150 or more for one male and six female chinchillas together

with an additional sum for cages, pumice (for baths), feed and supplies.[1] Each contemplated becoming a chinchilla rancher on the representations that "Chinchilla ranching can be done in basements, spare rooms, closed in porches and out buildings with minor modifications * * *" the chinchilla being "odorless and practically noiseless. * * * A profitable pastime that can explode into a FIVE FIGURE INCOME * * * requiring only about 30 minutes per day * * * interesting and inexpensive * * * costs only $3.75 per year per animal."[2] All plaintiffs alleged that the promises and representations made to them and on which they relied were false and fraudulent. None have had any financial success with their ranches in a period now of approximately three years.

■■ Diversity of citizenship exists in all seven cases, though the jurisdictional amount in controversy is found only because in the complaint each plaintiff seeks loss of profits in the amount of $10,000 and punitive damages of $5,000, which prayers the court was unable to say prior to the trial to a certainty and as a matter of law did not lie or could not be granted. Hedberg v. State Farm Mutual Automobile Ins. Co., 350 F.2d 924 (8th Cir. 1965).[3]

The case was tried to the court at Duluth, Minnesota on January 8, 9 and 19, 1970 with jury waived. It now has become clear that each of the suits is in effect one for a rescission. The court perceives no basis for assessing punitive damages,[4] and any substantial claim for loss of profits, even as to the three plaintiffs who are State of Wisconsin residents is so remote and speculative as to prevent any substantial recovery therefor.

None of the plaintiffs are sophisticated businessmen nor highly educated and are respectively a medical photographer; a millwright and carpenter; a mechanic employed by the railroad; a farmer engaged partly in construction work; a paper mill hand; a widow; and a housewife. All responded independently to defendant's television ads and soon thereafter were called upon by one of defendant's salesmen.

Although the actual representations made to each individual plaintiff vary somewhat, the general pattern was the same. In addition to the representations mentioned above, all plaintiffs were told, either in the literature or by the defendant's salesman that the average price of a pelt would be $20 or more up to $40 and if desired defendant would purchase the pelts from the ranchers; chinchillas are substantially disease free; the average number of young which each female will have in one litter is one to three and each female is capable of producing three litters per year; defendant would provide eight consultation meetings at each plaintiff's home with one of its experts who would inspect the herd and render advice; that defendant would arrange a general meeting with other chinchilla ranchers thus affording an opportunity to talk to experienced persons; no special skill or knowledge would be required to become a successful chinchilla rancher; income would progress yearly as the herds grew and after five years a rancher could expect in excess of $5,000 annual profit based on a mathematical progression formula.

The court finds that each of the plaintiffs relied on the fore-mentioned representations in entering into their contracts with defendant. To date none

---

1. Plaintiff Ida Mae Dayton purchased 12 females and 2 males at double the cost.

2. Plaintiffs' Exhibit 1, pages 2 and 13.

3. The fact that recovery ultimately allowed is less than $10,000 does not of course oust this court of jurisdiction if that amount originally was "in controversy".

The court is aware that aggregation of claims to meet the jurisdictional limits is not permissible. Neville v. Delta Ins. Co., 45 F.R.D. 345 (D.Minn.1968).

4. Even in plaintiffs' post trial brief, their counsel does not assert nor urge any recovery for punitive damages.

have ever sold or been able to sell any of the chinchillas for pelts, though some plaintiffs made real efforts so to do. The court finds that the pelts because of their size, inferior quality and color cannot be sold commercially or profitably. None of the plaintiffs as of the time of the trial had profited or had income from their venture by any amount.

It is true that the contracts which each of the plaintiffs signed in purchasing the chinchillas specifically disclaimed all written or oral warranties except as the same were reduced to writing and included in the actual sales contracts. The present suits however in reality are not brought for breach of contract or to enforce contractual rights, but are bottomed on fraudulent inducement by the defendant to purchase the chinchillas upon the faith of the various representations. Such actions sound in tort rather than in contract and thus are not controlled in any event by the terms of the contract between plaintiffs and defendant.

While it may be argued that none of the representations made by the defendant, when viewed in isolation amount to fraud per se, the court finds that when considered as a whole the various statements and the entire plan worked a fraud on plaintiffs. Defendant created the impression in its potential customers including plaintiffs that chinchilla ranching was an easy undertaking and that there was no requirement for any special skills, experience, knowledge or special facilities in order to become a successful chinchilla rancher. This court is convinced that it was fraudulent for defendant to sell the chinchillas to people whom they knew or well should have known most likely would be unable successfully to raise chinchillas for profit because of their lack of skills, proper environment and/or experience. The defendant's own witness testified that the raising of chinchillas is to some extent an art and that the environment in which they are raised must be carefully controlled as to temperature, humidity and noise. Throughout the trial it became readily apparent that a large number of the chinchillas were "chewers" and chewed their own fur so as to make such unmarketable as a pelt. The expert testimony received at trial indicated that while the exact cause of this "chewing" is not known, in some instances it can be controlled and even eliminated by proper control of the environment. By adjusting the temperature and the humidity in the room where the chinchillas are caged the desire for chewing can be lessened. Each plaintiff testified that at the time of the sale the defendant's salesman told them that his particular basement or room where he planned to raise the chinchillas would be "ideal" and that no changes in the area would be necessary. Defendant's vice president Shafer was a witness and asserted he was a successful home rancher, but that in his basement he had a humidifier, an air conditioner and an exhaust fan. He testified these were advisable. None of plaintiffs were told of this desirability. Another of defendant's witnesses examined several of plaintiffs' herds the day before trial and was critical of their locale and environment even though plaintiffs were told the contrary originally. The conclusion is inescapable that defendant knew or should have known that each of the plaintiffs was doomed to or at least seriously risking failure in the business of raising chinchillas and that to sell seven chinchillas for $2,150 or more to each plaintiff under these circumstances constituted a fraud.

Plaintiffs presented no direct evidence as to the reasonable value or cost of a chinchilla animal. The only evidence is that of witness Denzler who raised chinchillas from 1963 to 1969. He testified he purchased an original herd of 21 animals for a price of $900 and later bought a male at a price which he considered a bargain for $80.00 who sired 117 offspring. It is not an unwarranted conclusion however that a great portion of the price paid by the plaintiffs is attributable to the promised service visits of experts and other advisory aspects.

Plaintiffs' expert witness viewed the animals of three of the plaintiffs the day before he took the witness stand, and had previously viewed plaintiff Dayton's animals. The court finds from his testimony that of plaintiff Fischer's 78 animals, none were of salable quality due to a small neck, small size, light color and not being fully veiled. Of the Bauers' 18 animals, the court finds they had a value at best of $7.50 per pelt because of light color, chewing and medium size. The 30 Dayton animals had been put under a grading light and the court finds proved to be yellowish and thus not commercially valuable. This plaintiff actually tanned some pelts and was unable to sell them, though she had installed a humidifier, air conditioner and had revamped the room in which the animals were kept. Much the same general opinion was given as to the Symiczek animals and the court finds them to be commercially valueless.

Plaintiff Gruper's animals all died long prior to the trial despite his efforts to determine the cause thereof through a veterinarian and by freezing one dead animal as instructed and returning to defendant for analysis. The court finds they were felled by a disease.

Plaintiff Christensen has but 12 animals left after three years. Plaintiff Bauman has but five animals left and no male. She determined the animals to be sick and requested defendant to take them back but was refused. Those she tried to market were "chewed" and not salable.

All of the above would support at least an inference if not an actual finding that the quality of the animals sold to plaintiffs was inferior and they were not capable of producing pelts anywhere near the $20 and up to $40 value promised and held out to plaintiffs as attainable nor the numbers thereof promised.

■ In making its determinations, the court first must decide which state's law is to be applied since the plaintiffs reside in different states, four in Minnesota and three in Wisconsin. The fraudulent representations were made to each of them at their respective homes. Defendant urges that its primary place of business is Omaha, Nebraska and by the terms of each contract the transactions were not consummated until signed and approved in Nebraska. If this were strictly an action under the contract for non performance and not a tort case, then arguably the law of Nebraska might be applicable. However, applying the rule as set forth in Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this court must look to the Minnesota conflict of laws rule to determine which state's law should be applied in a diversity case. The Minnesota conflicts rule is that in an action for fraud or misrepresentation the law to be applied is the law of the state where the wrong or fraudulent inducements took place. Lowrey v. Dingmann, 251 Minn. 124, 86 N.W.2d 499 (1957); Hanson v. Ford Motor Co., 278 F.2d 586, 590 (8th Cir. 1960).

Thus in applying the substantive law in this case the court must look to Wisconsin law for the three plaintiffs who reside in that state and must examine Minnesota law as to the four residents of Minnesota. Nebraska law becomes immaterial. As to whether or not there was fraud practiced upon the plaintiffs there appears to be no significant difference between Minnesota and Wisconsin law, Hartwig v. Bitter, 29 Wis.2d 653, 139 N.W.2d 644, 16 A.L.R.3d 1303 (1966). The measure of damages may differ somewhat however as between the law of the two states.

■■ It is a well established principle that fraud cannot be predicated upon the mere expression of an opinion, when it is understood as being only such. Kennedy v. Flo-Tronics, Inc., 274 Minn. 327, 143 N.W.2d 827 (1966). Similarly representations as to profits to be made in the future usually are deemed expressions of opinion upon which an action for fraud ordinarily will not lie. Kennedy v. Flo-Tronics, supra. The elements constituting fraud in Minnesota were

clearly set forth in Hanson v. Ford Motor Co., 278 F.2d 586 (8th Cir. 1960), where the Eighth Circuit Court of Appeals reviewed the decisions of the Minnesota Supreme Court and defined the eleven or more elements of fraud.

Upon examination of the cases apposite to the instant situation it becomes readily observable that courts in the past have examined the disparity in knowledge and experience between buyer and seller and have held that it is fraudulent to sell something to a person who is obviously not able to use it because of his lack of experience or skills. In Spiess v. Brandt, 230 Minn. 246, 41 N.W.2d 561, 27 A.L.R.2d 1 (1950), two brothers, who were 21 and 26 years of age, bought a resort from the defendant. Neither had any previous experience in operating a resort, either large or small, whereas defendants who sold the resort were mature men of considerable experience in the resort as well as other business enterprises. In holding that the transaction was fraudulent on the part of defendants the court stated in part:

" * * * Although the element of disparity in business experience is not of itself a sufficient ground for relief, nevertheless, the law does not ignore such disparity * * *. Disparity may under some circumstances be a factor of considerable importance when we keep in mind that the question is not whether the representation would deceive the average man. * * * [T]he question is whether the representations were of such a character and were made under such circumstances that they were reasonably calculated to deceive, not the average man, but a person of the capacity and experience of the particular individual who was the recipient of the representations * * *." 41 N.W.2d at 566–567.

The Minnesota case most apposite to the instant one and almost a "cranberry" is Hollerman v. F. H. Peavey & Co., 269 Minn. 221, 130 N.W.2d 534 (1964), where the plaintiffs entered into a contract with certain defendant corporations for the purchase of the defendants' products and services, all of which have to do with on the farm feeding, production and processing of chicken broilers. The plaintiffs raised three flocks of chickens with an extremely high death and disease rate in each flock and very few of the chickens were able to be sold commercially. Prior to entering the contractual arrangements with the various defendants the plaintiffs received a brochure about the chicken raising business the contents of which are strikingly similar to the brochure used by the defendant in the present case. It read in part:

" 'The plan and programs described here will return to the careful broiler raiser an income roughly equal to half as much as is obtained from an average size farm in the Midwest— and it will do so for about 6 hours of one person's attention daily.' * * * 'Your success with this plan is virtually assured, if you follow the plan as described. * * *' The grower is assured that he is 'always going to get paid at least the minimum, or advance price' * * *

'This is a solid substantial program which combines the elements of security and success for the broiler raisers who become affiliated with them.' " 130 N.W.2d at 537.

The Minnesota court held these representations went beyond mere "puffing" or "salesman's talk." In noting that the parties in that case were not "on an equality" the court stated:

"Defendants had superior knowledge, or an opportunity for knowledge, of the problems which might be encountered in the conduct of the business. Because of their ignorance and inexperience in regard to matters concerning which material representations were made, plaintiffs had a right to rely upon the superior knowledge of defendants." 269 Minn. at 228, 130 N.W.2d at 540.

The court concluded that based upon the "highly colored" and "overly optimistic" representations made to the defendants there was sufficient basis to find fraud and misrepresentation citing Vulcan Metals Co. v. Simmons Mfg. Co., 248 F. 853, 856 (2nd Cir. 1918) which stated (Judge Learned Hand):

"* * * When the parties are so situated that the buyer may reasonably rely upon the expression of the seller's opinion, it is no excuse to give a false one * * * it makes much difference whether the parties stand 'on an equality.' For example, we should treat very differently the expressed opinion of a chemist to a layman about the properties of a composition from the same opinion between chemist and chemist, when the buyer had full opportunity to examine."

▮ Upon examination of the evidence presented in this case there can be but one conclusion. Selling each of the respective plaintiffs in this case a number of chinchillas to start a chinchilla ranch, for the price or $2,150 or more when none of the plaintiffs had any previous experience in chinchilla ranching taken together with all of the other representations made contemporaneously is an act of fraud upon these plaintiffs. So to sell a laborer a complicated computer, a blue-collar worker life insurance for an amount of premium which he could not possibly afford, a non-high school graduate a set of William James' Philosophy * * * is to sell a person something that he cannot use and that is of little, if any, value to him; and to do so by representing that it is readily and easily understandable and that there are no serious problems involved with the product and that there are substantial profits in the offing is to mislead. The plan here was neither economically feasible nor commercially profitable.

In determining the measure of damages to be awarded each respective plaintiff, the court is cognizant of two conflicting rules in actions for fraudulent representations inducing a contract. The first, which is said to be the majority rule, allows the plaintiff the "benefit of his bargain," that is, it allows him to recover what he would have received had the representations relied upon been true. The minority rule allows plaintiff only the amount which he is "out of pocket", that is, the difference in value between what he gave as consideration and what he actually received.

▮ It is clear that Minnesota follows the minority rule, that is, the "out of pocket rule." Lehman v. Hansord Pontiac Co., 246 Minn. 1, 74 N.W.2d 305 (1955); General Corporation v. General Motors Corp., 184 F.Supp. 231 (D.Minn. 1960). Under this rule plaintiffs cannot recover anticipated profits. General Corp. v. General Motors Corp., *supra*. In *Lehman, supra*, the Minnesota court stated that the measure of damages under the "out-of-pocket rule" is as follows:

"* * * [It] is the loss naturally and proximately resulting from the fraud, and it will usually be the difference between what the plaintiff parted with and what he got. * * * It is therefore not a question of what the plaintiff might have gained through the transaction but what he lost, by reason of defendant's deception." 74 N.W.2d at 311.

▮ This court holds it appropriate in all seven cases at bar to grant relief as for rescission. Each plaintiff should give back what he still retains of his herd, whether increased or decreased in number, his cages and any supplies on hand, and should recover what he has paid in cash on his or her contract with defendant, be released from paying any claimed balance due thereon and recover in addition his cash, out-of-pocket outlay and expenses as provided hereinafter.

▮ Under both the "loss of bargain" and the "out-of-pocket" rules an award can only be made for damages resulting directly and proximately from the fraud. General Corporation v. General Motors Corp., *supra*. 184 F.Supp. at 240. The court does not believe all of the damages claimed by plaintiffs are or

were directly and proximately caused by the fraudulent activities of the defendant. The court makes the following findings:

 A claim is made on behalf of each plaintiff for the labor which he or she expended in his or her chinchilla ranching venture. The rate of two dollars per hour was applied in each instance and the respective claims ranged from $970 to $3,630. None of the plaintiffs testified during trial that he gave up his regular employment or shortened the hours which he could spend at his regular vocation because of the time spent on the chinchillas. The time so spent came from the plaintiffs leisure time and did not directly cause any of them any economic loss. Admittedly the plaintiffs had less leisure time for other hobbies or activities but the court under the "out-of-pocket" theory or otherwise cannot ascribe any monetary value to this. So the court disallows plaintiffs' claim for damages based upon time spent in working with the chinchillas.

 Plaintiff Bauers testified that he built an additional room onto his house to accommodate his chinchilla business and that he expended $1,200 for this construction. This room certainly will not lose its value to plaintiff upon termination of his chinchilla business. To allow plaintiff to recover this amount from defendant would be unjustly to enrich him. Thus the claim of plaintiff Bauers for the $1,200 for construction costs is denied.

 The same reasoning as used above is apropos to the claim made by plaintiff Dayton as to her expenditure for heaters and fans in the amount of $360, and as to plaintiff Bauman for an item of $130 for a heater. Both of these claims are hereby denied.

 Each plaintiff claims damages for the cost of heat and electricity. The court was not presented with any evidence to support a finding that each plaintiff would not have heated the rooms where he or she caged the chinchillas had he or she not purchased them and thus holds that these expenses are not directly and proximately caused by the fraudulent activities of defendant.

 The court finds that the expenditures made by each plaintiff for supplies, cages, food, etc. are legitimate claims as they were made as the direct and proximate result of the fraudulently induced contract. Absent such contracts these appropriations would not have been made and so recovery for the aforementioned claims is allowed.

The automobile costs claimed by each plaintiff involved traveling to meetings with other chinchilla ranchers and to get feed and supplies. While defendant argues that the figures included for said expense are extremely high, it offered no evidence to contradict the same and the court will allow full recovery for such costs since they are directly and proximately the result of the defendant's fraud.

 The principal remaining claim made by each plaintiff is for the "loss of 3 year Bargain." By this claim plaintiffs presumably seek to recover the profits which they would have made had defendant's representations in fact been true. A chart was shown to some of the plaintiffs by defendant's salesmen which diagramed the estimated future income which a chinchilla rancher could expect over a given amount of time. This indicated an income (not necessarily net profit) of $721 during the third year of ranching. Presumably expenses would be deducted from this figure of income which is based on a purported National average of $21.60 per pelt.[5] To those to whom the chart was not shown, the salesman made similar representations. As above indicated such a claim may not be allowed as to those transactions which occurred in Minnesota.

As to the three plaintiffs who reside in Wisconsin, i.e., Gruper, Bauman and Christensen, and considering that Wis-

---

5. Plaintiffs' Exhibit 3, p. 2.

consin is committed to the majority, or "benefit of the bargain" rule (Anderson v. Tri-State Home Improvement Co., 268 Wis. 455, 67 N.W.2d 853 (1955)), and even though the court regards these as essentially rescission actions, the court will allow $200 to each. In any event, no great profits were expected or promised until after the fifth year and such are remote, contingent and speculative. See 13 A.L.R.3rd 875 for an exhaustive annotation on the general subject of the majority and minority rules.

██ Defendant sought at the trial to introduce a Federal Trade Commission consent decree entered in a civil proceeding whereby defendant agreed to cease and desist from certain claims, representations and advertising. This consent decree was entered into by defendant after the occurrence of the fraudulent activities involved in the present suit. The court did not and does not now allow the consent agreement nor the accompanying order to go into evidence, analogizing the situation to one in which courts have consistently disallowed the introduction of Federal Trade Commission consent decrees in civil antitrust suits. Perhaps a better basis for its non admission however is that since the Federal Trade Commission order was entered after the fraudulent activities complained of in these lawsuits, the actions of the defendant in relation to each of the plaintiffs did not go towards showing bad faith in violating this decree, nor was any reference in the consent agreement made to the events involved in this case. Thus the findings of the court herein expressed in no way reflect or are influenced by the findings of the Federal Trade Commission in said order. The court's findings are based entirely upon the evidence presented before the court.

██ The following schedule represents the amount of damage allowed to plaintiffs in each case. Since plaintiffs' claims were unliquidated, plaintiffs are entitled to interest only from date of entry of judgment herein.

1. ADOLPH FISCHER:

| | |
|---|---|
| Payments on Contract | $1,405.00 |
| Supplies | 340.71 |
| Food | 239.58 |
| Car costs | 300.00 |
| TOTAL | $2,285.29 |

2. GLEN CHRISTENSEN:

| | |
|---|---|
| Payments on Contract | $1,564.00 |
| Supplies | 93.94 |
| Feed | 61.65 |
| Car costs | 179.00 |
| Loss of bargain | 200.00 |
| TOTAL | $2,098.59 |

3. JOHN SYMICZEK:

| | |
|---|---|
| Payments on Contract | $1,675.31 |
| Supplies | 134.15 |
| Food | 195.52 |
| Cages and other supplies | 95.00 |
| Car costs | 150.00 |
| TOTAL | $2,249.98 |

4. IDA MAE DAYTON:

| | |
|---|---|
| Payments on Contract | $2,659.60 |
| Feed | 175.62 |
| Pens | 53.40 |
| Veterinarian | .10.00 |
| Car expenses | 150.00 |
| TOTAL | $3,048.62 |

5. JANICE BAUMAN:

| | |
|---|---|
| Payments on Contract | $1,037.00 |
| Feed | 100.00 |
| Supplies | 190.00 |
| Car Expense | 150.00 |
| Loss of bargain | 200.00 |
| TOTAL | $1,677.00 |

6. BRUCE N. GRUPER:

| | |
|---|---|
| Payments on Contract | $2,175.00 |
| Supplies | 137.00 |
| Feed | 35.00 |
| Loss of bargain | 200.00 |
| TOTAL | $2,547.00 |

7. GENE R. BAUERS:

| | |
|---|---|
| Payments on Contract | $1,075.00 |
| Feed and hay | 139.10 |
| Supplies | 75.17 |
| Car expenses | 74.30 |
| TOTAL | $1,363.57 |

It is ordered that each plaintiff have judgment for the amount of money set after his or her name and be released from any further liability to defendant.

It is further ordered that contemporaneously with and at the time of payment of the judgments, defendant may take possession of and title to, at its own expense and at and from the respective plaintiffs' homes or locations of the chinchilla, all animals, cages and supplies on hand and in possession of each plaintiff. This opinion shall be in lieu of findings of fact as required by Rule 52(a) of the Federal Rules of Civil Procedure. Plaintiffs may tax costs.

Let judgment be entered accordingly.